Appellant ready to proceed? Yes, Your Honor. You may. Thank you and good morning, and may it please the Court. Eric McArthur, on behalf of the Plaintiff's Appellants, I have reserved three minutes for rebuttal. The core problem in this case is that CMS treated plaintiffs, a group of anesthesiology practices, as if they were their patients' primary care providers, even though it knows full well they are not. CMS adopted the cost measure at issue, the total per capita cost, or TPCC measure, in order to hold primary care providers responsible for their patients' total Medicare costs on the theory that primary care providers are in a position to influence those costs by managing their patients' overall care. CMS recognized to its credit that specialists like anesthesiologists shouldn't be scored on this measure, and it therefore excluded them from the attribution methodology it uses to assign patients to providers. But CMS arbitrarily refused to exclude nurse practitioners and physician assistants who work in excluded specialties, even though they are identically situated to the specialists they work alongside. Now, I know that's rather abstract, so I want to try to make this concrete for you, if I can, with an example. Let's suppose you're a Medicare patient and you go in for an outpatient surgery. And after your surgery, before releasing you, the nurse practitioner, who works for the anesthesiologist, comes and does a postoperative checkup in which she asks you about your pain level or checks your pain medication. Under CMS's attribution methodology, as a result of that service, that nurse practitioner can be assigned your entire Medicare costs for the year, even if she never saw you before, never sees you again, and has nothing to do with your overall care. Now, if the anesthesiologist himself had done the checkup, there would be no attribution because he is excluded. But the nurse practitioner is on the hook for your entire Medicare costs for the year. As a result of that unlawful attribution methodology, plaintiffs were scored on the TPCC measure as if they were primary care providers, resulting in a total loss of nearly $4 million in Medicare reimbursement for this year alone. On appeal, CMS has almost nothing to say in defense of its arbitrary attribution methodology. Instead, it principally contends that Congress bar judicial review of its decision. But CMS is wrong. Because that's a threshold issue, I will turn to it first. And the place to begin on that issue is with the strong presumption in favor of judicial review, a venerable principle that CMS in its brief simply ignores. To prevail here, CMS must show that Congress clearly and convincingly barred judicial review of its decision to apply a cost measure to providers who have no responsibility for the relevant costs. That is a high bar, and CMS can't meet it here. It relies principally on subparagraph B3 of the judicial review bar for the MIPS program, which is in subsection Q13. That provision bars review of the identification of measures and activities specified under paragraph 2B. Now, that measure, just that doesn't mean the anesthesiologist doesn't get paid for work he's done, does it? It's just what you're trying to measure is, is there a supplement or a deduction from it. That is correct. The anesthesiologist will get paid, but the reimbursement rate that Medicare pays can be docked based upon the score that they're getting on this and the other measures. So the review bar that I just quoted doesn't bar our claims because we are not challenging CMS's identification of the TPCC measure. To get a cost score, you need two things. You need a cost measure, that is a set of patient costs, and you need an attribution methodology to tell you which provider or providers those costs will be assigned to. The review bar by its terms applies only to the former, and we are challenging the latter. But how is the attribution methodology not part and parcel of the CMS's identification of measures and activities? That is exactly CMS's argument, and I think it's incorrect for a number of reasons. First and most importantly, it's incorrect as a textual matter under this statute. Textually, in this statute, Congress distinguished between the identification of a measure and the selection of an attribution methodology. You can challenge all the components of the CMS's identification of a measure, but you can't challenge the composite. Well, I don't know that I would go that far. Isn't that the practical effect of what you're trying to do? No, I would disagree with the premise, Judge Wilson, because I don't think that the attribution methodology is a component of the TPCC measure. It is something that CMS uses together with the measure in order to get a cost score for the provider, and I get that from four key textual points in the statute. So the first is that the statute consistently refers to attribution as a methodology, but that word does not appear in subparagraph B3. It only talks about identification of the measure. Second, the provision that subparagraph B3 cross-references, that's subsection Q2B, addresses identification of the measure and selection of the attribution methodology separately. It directs CMS to one provision for identifying the measure and to a different provision for selecting the attribution methodology. Third, other provisions in the review bar, subparagraphs B1 and B4, do bar review of methodologies, showing that Congress knew how to do that when it wanted. And fourth, elsewhere in the statute, when Congress did preclude review of an attribution methodology, that's subsection N9G, it did so expressly, using that word, methodology. So if Congress had intended to bar judicial review of attribution methodologies in the MIPS program, it undoubtedly would have done so expressly and not left the matter simply to implication. And that is especially so because it's not as if attribution methodologies are some administrative minutia that Congress was unaware of. On the contrary, this was top of mind for Congress at the time that it enacted this review bar. We know that because at the same time Congress established the MIPS program in subsection Q, it also enacted subsection R, which is all about attribution methodologies. So CMS would have you believe that even though Congress, elsewhere in the statute, expressly precluded review of an attribution methodology and enacted this bar at the same time it's got a separate subsection on attribution methodologies, it precluded review sub silentio in the MIPS program of attribution methodologies. One further point on this that I think it bears emphasizing is that it's not as if Congress barred review of every aspect of what CMS is doing in the MIPS program. Far from it. This is not a blunderbuss review bar. It is far closer to a scalpel. It would have been very easy if Congress had wanted to bar review of all aspects of what CMS is doing to simply say there shall be no administrative or judicial review of any action under this subsection. It didn't do that. Instead, it enacted a targeted list of provisions that are barred. And in fact, if you read through subsection Q from front to back, I wouldn't recommend it if you can avoid it. It is some tough statutory sledding. But if you read through that provision, you'll see that there are 12 paragraphs before you get to paragraph 13 where the judicial review bar gives tasks to CMS that it must undertake in order to set up and implement this program. The review bar mentions only six of them, paragraphs 2 through 6 and 9. That leaves six paragraphs untouched. And even in one of the paragraphs that Congress addressed in the judicial review bar, this is in subparagraph B1, addressing paragraph 6, it only barred review of what the agency does under 6A and 6D, leaving the other subparagraphs untouched, including 6D, which is a very important part of the methodology. 6D is where CMS has to establish a performance threshold, which becomes the benchmark against which it judges providers' performance. The review bar doesn't touch that. So Congress was careful here, and I think that counsels also in favor of careful interpretation. In that respect, this case bears more than a superficial resemblance to the Supreme Court's decision in Reno v. American-Arab Anti-Discrimination Committee. That's a case we cite in our briefs. In that case, the Supreme Court confronted a statute that expressly barred judicial review of specified, pre-specified actions relating to the deportation process. And actually, all of the parties in that case before the Court had simply assumed that that provision meant that Congress had barred review of every aspect of the deportation process. And Justice Scalia, in his opinion for the Court, said, not so fast. That's not how we read statutes. Congress was careful to specify just these three actions, and therefore, that is all that is precluded from judicial review. All other actions related to the process are open to judicial review. Also bears emphasis that CMS has historically treated the two as distinct, and there are three points in the history of the program that I would draw Your Honor's attention to. The first is in 2011. That's when CMS very first established the TCC-TPCC measure for use in the predecessor value modifier program. In that 2011 rule, CMS identified the cost measure and did so without selecting an attribution methodology. It did not select an attribution methodology until a year later, in 2012, in a new rule, a year after it had identified the cost measure. Then you get to 2016, when CMS identified the TPCC measure for use in the MIPS program. It adopted the existing measure from the value modifier program, but changed the attribution methodology. And then you get to 2019, in the rule at issue here, when it changed the attribution methodology. It did not say it was identifying a new measure. It said it was changing how the existing measure is attributed. The agency said expressly at page 62-969 of 84 Federal Register, we continue to believe that the existing measure is appropriate to use in MIPS. So I think the agency cannot make out a clear case that Congress barred judicial review of attribution methodologies as opposed to identification of the measure. Now, there are a couple of other jurisdictional issues. CMS also invokes the review bar for the predecessor program in subsection P10C. That doesn't even apply to the MIPS program. And they make some arguments about how the district court lacked jurisdiction under section 405G. I think we have adequately explained why those contentions are equally meritless in the brief. And unless the Court has specific questions on those, I would What's your best case on the premise that identification of measures and attribution methodologies are treated separately and not barred, the attribution methodologies are not barred from review? I don't know that I have a specific case that addresses that. I mean, obviously the case that has gotten the most discussion in the briefs is this Court's decision in Paladin. But I think that case is inapposite because the key to the decision in Paladin was that the Court could not review the action the plaintiff was challenging without also reviewing the action that Congress had shielded from review. That is not the case here. As a functional matter, the Court can review the attribution methodology without ruling on the legality of the TPCC measure. You don't need to hold the TPCC measure unlawful to rule in our favor. The remedy that we're seeking would not disturb the TPCC measure. They can keep the measure. They can keep applying it to primary care providers. They just can't apply it to specialists like my clients. Really what you're arguing about is the whatever favorable treatment is given goes to the nurse assistants and the physician assistants rather than to the anesthesiologist. Isn't that right? It should go to them both because they're identically situated. And that goes to the patient if I sit down. So the attribution methodology is unlawful both because it violates the statute and because it is arbitrary and capricious. As to the statute, the core command of the MIPS statute right up front in subsection Q1A is to develop a methodology for assessing the total performance of each MIPS eligible professional. That text plainly requires CMS to score providers based on their own performance, that is, based on factors that are within their ability to control or at least influence, which is hardly surprising in a program entitled the Merit-Based Incentive Payment System. Factors outside a provider's control have nothing to do with that provider's merit. And penalizing a provider for factors outside his control creates no incentive for the provider to improve his performance. This relates to the primary care, does it not? This relates to scoring providers who do not have primary care. The idea is you're looking to improve the efficiency of primary care. That is the idea behind the measure when it's applied to physicians who have primary care relationships with their patients in which they're involved in the ongoing care. And that goes to, I think, the arbitrary and capricious claim, which is about the 2019 rule in which CMS adopted this attribution methodology. The stated purpose in the 2019 rule, I think this is common ground, of the attribution methodology is to capture providers who have real primary care relationships with their patients, that is, relationships in which they are involved in the ongoing management of the patient's overall care. In that rulemaking, CMS excluded specialists, including anesthesiologists, from the attribution methodology because it recognized that even though they sometimes provide primary care services, they do not have primary care relationships and, therefore, can't be held accountable fairly for their patients' total Medicare costs. The same exact logic applies to nurse practitioners and physician assistants who work solely in an excluded specialty, and yet CMS refused to exclude them. In so doing, CMS violated the APA in at least two respects. One, it illogically treated like cases differently, and two, it adopted a rule that conflicts with the agency's own stated goal to identify real primary care relationships. Now, CMS tried to justify its decision by saying, well, the problem only occurs infrequently, but the agency's own data show that this attribution rule will rope in one in 20 specialty practices. That's thousands of practices across the country that are going to get hit by this arbitrary attribution rule that treats the nurse practitioners and physician assistants as if they're their patients' primary care providers. More fundamentally, though, just stating that a problem occurs infrequently is not a rational reason to refuse to fix the problem. At a minimum, CMS needed to reason through the options to fix this problem, think about their costs and benefits before imposing a rule that arbitrarily penalizes specialty providers for patient costs that are entirely outside their control. The Court has no further questions. I'll reserve the remainder for rebuttal. Thank you, Counsel. Ms. Lopez. I'm going to have to put this down a bit for me. May it please the Court, Carolyn Lopez, on behalf of the government. Section Q13B3's bar on the review of the, quote, identification of measures and activities specified under Q2B bars plaintiffs' challenge to the Secretary's specification of the subset of Medicare costs that are measured under the TPCC formula. And I think it's helpful to sort of take a step back here and talk about what the TPCC measure that is being challenged actually looks like. So to do that, one place that I think is really helpful to look in the record is ROA 5730. So specifically here, the Secretary has identified the TPCC measure as an eight-step formula. Under that formula, they've further specified that at step two of the formula, CMS will look to see if a clinician's patient's costs should be excluded from the formula because the physician is part of an excluded category. But if not, what the formula does next is continue to attribute those patient costs to that clinician as part of the measure. And then CMS goes through the remaining steps and calculates the final TPCC measure score, which is that cost efficiency measure. So there's really no way to separate out that step two, which is what plaintiffs are saying is this totally different attribution methodology. It's literally step two of the TPCC. But has the agency treated the attribution methodology and the identification of measures as separate and discrete considerations? Certainly not under the MIPS program. I can't really speak to what was happening in 2011, but what we're talking about, of course, is the MIPS program. That's the predecessor program. And in the MIPS program, so for example, we cite in our brief, this is at 84 Fed Reg at 62.9.62. CMS specifically said the attribution methodology can't be separated out. It's part of the measure. And again, it's clear that at the very least with respect to this measure that's being challenged today, that CMS treated it as one step in the formula. Was that a departure from prior practice? It was not. And thank you for the opportunity to clarify that. I think plaintiffs are really, in their reply brief, really read that statement at that page totally out of context. So what CMS was saying there is it used to be that every time CMS made an even sort of a small tweak to the TPCC measure, it did that specifically in the regulations text. So you can see this, what I'm talking about, you can also see this reflected in the text of the regulation, which is 42 CFR section 414.1350B. And so it used to be, so B1 through B7 is sort of every time they changed the attribution methodology, it was in the text of the regulation. And then what CMS says is a departure. It's not that it suddenly now thinks of the attribution methodology as part of the identification of the measure. What it's saying is instead of doing that in the text of the regulation, at least for minor changes, we're going to do this on the CMS website. So that pin site in the rulemaking refers to the CMS website. And then that's going, sort of going back to the regulation that was being changed there, that's B8. And B8 now says each cost measure is attributed according to the measure specifications for the applicable period. And so the measure specifications is that form that it was referring your honors to at ROA 5730. And so it's not talking about treating the underlying attribution methodology any differently. It's just sort of where that is going to be described, the place it's going to be described. That's the change, not the way that they treat it. And if you're, I want to make sure that I also return to the plain text as well. I thought it'd helpful to sort of ground us in what the TPCC measure actually looks like first. But going back to the plain text, so the primary review bar that we're talking about is Q13B3. And in Q13B3, it says there shall be no, and this is that addendum pages 3 through 4, there shall be no administrative or judicial review under section 1395FF of this title, section 1395OO of this title, or otherwise of the following. And that's the exact language, that initial phrase is the exact language that this court found in Paladin indicates an intention to have a clear review bar. And then the subprovision that's important here is, so there's going to be no administrative or judicial review of, quote, the identification of measures and activities specified under Q2B. So then if we turn to Q2B, and this is that addendum page 3, our friends on the other side didn't sort of discuss the opening clause of that. The opening clause of Q2B provides that, quote, measures and activities specified for a performance period as established under paragraph 4 for a year are as follows, i.e., what follows are the identification of measures and activities that are specified under paragraph Q2B for which 13B clearly bars review. And then when you turn to the definition, Q2B2, which is the definition for cost measures, there, the very definition of what's being specified and therefore barred from review specifically references both the measurement of resource use for such period under subsection P3 and using the methodology under subsection R, which is a potential attribution methodology, as appropriate. So the definition of what is being identified and specified under the expressly refers to both, sort of both agency actions that plaintiffs are trying to separate out. And you're citing that last part of the statute is 13B, Romanet 4? Sorry, Q2B2. Which on my addendum is at addendum 3. I'm looking at addendum 3, I guess, but, and 4. And I'm keying in, I guess, on the words methodology, which appears several times here. So your argument is that that clearly includes attribution? Absolutely. So what the propagatory phrase to Q2B says, it says these four enumerated things that come over afterwards, those are the measures and activities specified for a performance period. And what we know from Q13B is those measures and activities that are specified under Q2B, that's what's barred from review. And then when you look to the definition of what is going to be identified for the cost measure, which is one of those four enumerated things, so that's Q2B2, that definition refers to both the measurement resource use and using the methodology, which makes crystal clear that the review bar applies to both. And even if your honors were to think that there was sort of some little bit of daylight in between those two actions, it's certainly inextricably intertwined with the shielded agency action because there's simply no way to figure out what the TPCC is measuring unless you figure out what the subset of costs are. And the subset of costs are specific patient costs that are, you know, that are attributed to particular physicians. Otherwise, it's not, you know, unless you know what you're measuring against what, you don't have any measure at all. So that's our primary argument. When we get past that and get into the merits, it does seem incongruous to me that you're attributing costs to nurse practitioners and physician's assistants in a practice, a specialty practice that's otherwise excluded from attribution of cost, right? I mean, how do you do that? How do you square the circle? I do want to emphasize, of course, that we do think that the exact reason that Congress had these really specific and broad review bars is because they didn't want sort of tinkering about where the secretary drew the line in this type of budget neutral program. But we do also I get all that. But I mean, you're excluding anesthesiologists from inclusion in the So how is how is a nurse practitioner who works or a physician's assistant who works for an anesthesiologist practice suddenly swept in as a primary care provider? Absolutely. So assuming that one could get to this question, which the government disagrees, so putting putting that aside, we think so what CMS has done here is completely reasonable, which is to say, different sort of categories of clinicians tend to provide different care. And so often and remember, the rules for sort of is for all practices. And sometimes with rules, even where there is review, things happen to work out sort of poorly for one practice. And so nobody goes to a nurse who works for an anesthesiology practice for primary care. It's going to be a follow up visit. It's going to be a pre consult. I don't know. But they're not going there like I would go to a nurse practitioner at my family practitioner's Sure, Your Honor. So so so here CMS has for years said nurse practitioners and physician assistants are the type of clinicians who tend to provide primary care. They do that by looking at the underlying Medicare data. If the underlying Medicare data did not indicate that these nurse practitioners were billing for primary care, they wouldn't come measure. That's a completely reasonable line for the agency to draw. And so, for example, I think here, looking at what the nurse practitioners actually billed for is helpful as well. So this is a ROA 7442. And so the one of the things that they bill most frequently for is indicating an office or other outpatient visit for the evaluation and management of an established patient. It's completely reasonable for for CMS to say that sure looks like providing primary care. And again, it's not just that they're doing that in the context of a practice that is excluded because they don't provide primary care. Well, it's not the practice that's excluded. It's specific types of specialists within that practice. So the findings were and this is at 84 Fed Reg 62972. The findings were that anesthesiologists frequently perform non primary care services and therefore are unlikely to provide primary care. Not that they never provide primary care. Are there practices like family practices that have an anesthesiologist in the office? Mine doesn't. I'm not aware of one. I mean, in other words, this is a highly specialized subset of medical providers. It's just hard for me to understand how a nurse prac or a physician's assistant who has to be supervised by a physician is going to be I think there it's helpful to look back at what goals CMS is trying to get at with a primary care. And we talk about this at our brief. So the two goals that we think are sort of most applicable here are that part of primary care is quote conducting patient follow-up. It's to incentivize so these types of measures are to the TPCC measure is to incentivize folks to quote conduct patient follow-up and to quote coordinate care among specialists. And that sure sounds like something that nurse practitioners could do. Right? They're conducting patient follow-up after a procedure and they sure could be coordinating the follow-up care that you need to get after a surgery. And so it's completely, you know, again, assuming that the court can get into this at all, that is a reasonable line for the agency to be drawing. And plaintiffs have lots of options if they don't like where CMS drew that line. One of those options is not to bill is to choose not to bill as a group anymore and to bill as individuals. Because what they're really complaining about is not sort of the nurses, you know, we get less payment for what the nurses bill. What they're really complaining about is because we choose to act as a group with these nurses, our anesthesiologist bills are also reduced. So they could choose to behave, you know, to act differently under the MIPS program. And then, you know, this is an iterative process as indicated by the fact that CMS has updated the TPCC measure in response to feedback. It's just doing it in a slow and measured way, which is a completely regular way when proceeding either by legislation or by regulation in addressing a problem to sort of move in sequential steps. And so plaintiffs are also free to urge CMS to adopt a different methodology in the future. But again, none of that gets around the preclusion of review bar that clearly bars these types of challenges. If there are no further questions, we rest on our briefs and ask that the court affirm the district court here. Thank you, counsel. Rebuttal. Just a few points, Your Honors. Ms. Lopez started out by talking about the formula that the agency has written to implement the TPCC measure. How the agency wrote its formula is irrelevant to the meaning of the statute. We are in a post-Loper Bright world, and the agency's views don't have any special weight in interpreting the statute. I take Ms. Lopez's core point, though, that what in order to ultimately get a score on cost, you need both steps. You need the set of patient costs, which I think is the measure, and you need the attribution methodology. That is true. But it does not follow from that that Congress barred both of those steps or that the attribution methodology is part and parcel of identifying the cost measure. My car needs gasoline to run. That doesn't mean that gasoline is part of my car. That means my car uses gasoline to run down the road. Same way here, CMS uses an attribution methodology together with the measure in order to get a score. And there are things that go into calculating the measure. For example, 2016, commenters suggested to CMS that in looking at the TPCC measure, you should include not just Medicare costs, but costs across the entire healthcare system using other payer claims databases. CMS rejected that. If you look at subsection Q2D, another choice that CMS has to make, set outright in the statute, is they have to decide whether to include the costs of Part D prescription drugs in the patient costs. Those are the types of decisions that CMS is making when it is identifying the measure, and Congress precluded review of those, not of the attribution methodology, which is a separate and discrete step. Ms. Lopez focused on the introductory language in Q2B. But the key to that provision, it's set up in a rather odd construction. The construction is the measure is A using B. Using B. It doesn't say the measure is A and B. It doesn't say the measure is A including B. It says using B. That's an odd structure to my mind. That means the measure is A and B is something the measure uses. But at a minimum, that's an ambiguous phrasing. If it's ambiguous, that's when the presumption in favor of judicial review kicks in. On the merits, everything that Ms. Lopez had to say about how NPs and PAs and specialty practices are in a position to oversee patient care, all of that is post hoc. There's not a word about that in the 2019 rule. They didn't say we're rejecting your proposal to exclude them because they do oversee patient care. They said only it happens too infrequently. She also pointed to the line that it's appropriate because they appear to provide primary care services in the claims data. Same exact thing is true of the excluded specialists. They, too, provide services that are classified as primary care services, and the exclusion kicks in after they have provided that service. CMS should have done the same thing with the PAs and NPs. All right. Thank you, counsel. The court will take this matter under advisement.